# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DARIUS HARRIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:15-cv-252-NJR-DGW |
| | ) |
| DENNIS LARSON, VIPIN SHAH, | ) |
| ZACHARY ROECKEMAN, and | ) |
| NURSE L. BRADBURY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**WILKERSON, Magistrate Judge:**

Several motions are pending before the Court: a Motion for Summary Judgment filed by Defendants Nurse Bradbury, Dr. Dennis Larson, and Dr. Vipin Shah on June 5, 2017 (Doc. 156), a Motion for Preliminary Injunction filed by Plaintiff Darius Harris on January 23, 2018 (Doc. 173), and a Motion for Recruitment of Counsel filed by Harris on January 23, 2018 (Doc. 172). For the reasons set forth below, the Motion for Summary Judgment is granted in part and denied in part, the Motion for Preliminary Injunction is denied without prejudice, and the Motion for Recruitment of Counsel is granted.

### PROCEDURAL HISTORY

Plaintiff Darius Harris, an inmate of the Illinois Department of Corrections currently housed at Graham Correctional Center, is proceeding on a Fourth Amended Complaint filed pursuant to 42 U.S.C. § 1983 on December 8, 2015 (Doc. 65). Harris alleges that Dr. Larson, Dr. Shah, and Nurse Bradbury were deliberately indifferent to an

injury he suffered to his left pinky finger and right knee on August 2, 2010 (Counts 1 and 2). Warden Zachary Roeckeman, the Warden of Big Muddy River Correctional Center, where Harris was previously housed, was retained in this lawsuit to perfect any injunctive relief that may be ordered. Warden Craig Foster is now **SUBSTITUTED** for Warden Roeckeman because he is Harris's current custodian at Graham.

Since filing the Fourth Amended Complaint, counsel was recruited to represent Harris (Doc. 123). Defendants filed their motion for summary judgment on June 5, 2017 (Doc. 156). Harris's counsel filed a response (Doc. 163), but subsequently was granted leave to withdraw, at the request of Harris, on January 9, 2018 (Doc. 169). Harris was then granted until January 29, 2018, to file any additional response to the motion. No additional response was filed. Instead, Harris filed a motion for recruitment of counsel (Doc. 172) and his third motion for preliminary injunction (Doc. 173). The motions are now ripe for consideration.

## Background

On August 2, 2010, Harris, who was housed at Western Illinois Correctional Center at the time, hurt his left pinky finger and right knee while playing basketball (Defendants Statement of Undisputed Material Fact (DSUMF), Doc. 157, ¶ 2). He "jammed" his finger but continued to play basketball until he turned wrong and heard his knee "pop" (Doc. 157-5, p. 5). Harris was taken to the healthcare unit by wheelchair and visually examined on that day by Nurse Bradbury (DSUMF ¶ 3; Doc. 157-5, p. 5). Harris testified at his deposition that he told Nurse Bradbury he injured his finger and knee (which was obviously swollen), that he could not walk or put pressure on his knee,

and that he believed that he had torn his Anterior Cruciate Ligament (ACL) (he had heard his knee pop, and he had seen the injury before while playing sports in high school) (*Id.* at p. 6). Nurse Bradbury commented that Harris was not a doctor and therefore could not know he injured his ACL (*Id.*). She nonetheless visually examined his knee and noted no bruising or no swelling (DSUMF ¶ 3). She also observed that Harris could extend his leg (*Id.*). She gave Harris 325 mg of Tylenol to be taken four times a day, an ice pack, and instructions to keep his leg elevated and to avoid lifting, sports, or strenuous activity (*Id.*). She did not refer him to a doctor on that day (*Id.*). According to Harris, Nurse Bradbury refused to examine his finger because, she said, Harris was only there to discuss his knee. She told him to put in a nurse sick call request to be seen for his finger (Doc. 157-5, p. 6). Harris walked from the healthcare unit back to his housing unit with a "heavy limp" and experienced pain while walking around the prison to get to yard and the chow hall (Doc. 157-5, p. 11).

On August 30, 2010, Harris was examined by Dr. Shah after he complained of knee pain (DSUMF ¶ 5). Dr. Shah did not manipulate the knee but found Harris had 100 percent range of motion with no swelling (*Id.*). He diagnosed Harris with knee pain and added exercise to strengthen his muscles and ligaments (*Id.*). Harris told Dr. Shah that the swelling had not gone down, nearly a month after the injury, and relayed the pop that he heard and the pain he felt (Doc. 157-5, p. 7). He expressed to Dr. Shah that "this is kind of serious," and that he needed pain medication (*Id.*). Dr. Shah did not give Harris any pain medication, however, because he was going to be transferred to Stateville Correctional Center on a court writ in a few days and would not be allowed to take the

medication with him (*Id.*). Dr. Shah instead told Harris to talk to the doctors at Stateville when he got there (*Id.*).

Harris testified that once he was transferred to Stateville, he was examined by a doctor in early September 2010 (*Id.* at p. 8). That doctor followed the same course of conservative treatment (pain medication, exercise, and an analgesic rub), but also may have ordered an x-ray (*Id.*).

On September 20, 2010, Harris was seen by Nurse Bradbury at Big Muddy River Correctional Center for the pinky finger injury he had also sustained on August 2, 2010 (DSUMF ¶ 6).[1] She noted that it was swollen and crooked, but not painful, and referred him to the doctor (*Id.*). Dr. Shah saw Harris two days later, prescribed 400 mg of ibuprofen (to be taken twice a day), and ordered an x-ray of the finger (*Id.* ¶ 7). The x-ray revealed a "small avulsion facture" that should heal without any surgical intervention (*Id.* ¶ 8). Dr. Shah noted that the fracture could heal on its own and instructed Harris on how to exercise his finger (*Id.* ¶ 9).

Harris again complained of knee pain and was examined by Dr. Jill Wahl (who is not a defendant) on October 13, 2010 (*Id.* ¶ 11). Dr. Wahl also found Harris had a good range of motion and a normal gait. She prescribed an analgesic balm, and a subsequent x-ray, taken on October 14, 2010, revealed no bony fracture, dislocation, or sizeable joint effusion (*Id.* ¶ 12).[2] The diagnosis of knee pain and conservative treatment continued

---

[1] Dr. Larson attested in his affidavit that the medical records reveal Harris told Nurse Bradbury he injured his finger on August 2, 2010, but did not tell anyone (Doc. 157-1, p. 2). Harris testified, however, that he did previously complain about his finger (Doc. 157-5, p. 9).
[2] According to the medical records, Dr. Wahl ordered an x-ray of Harris's knee (Doc. 157-1, p. 6), but according to Harris, Dr. Shah ordered the x-ray (Doc. 157-5, p. 10).

when Dr. Shah saw Harris again on November 8, 2010 (*Id.* ¶ 13). At this appointment, Harris told Dr. Shah that the swelling and pain had been going on too long and that he did not think an x-ray would show what is wrong with his knee because an x-ray only shows problems with bones. Harris told Dr. Shah he needed an MRI (Doc. 157-5, p. 10). Dr. Shah found, however, that Harris had no swelling, a normal range of motion, and that his x-ray was negative (DSUMF ¶ 13). This was the last time Dr. Shah saw Harris for his knee or finger injuries. At this point, a couple months after his knee injury, Harris was able to play basketball again, but his knee still "bugged" him (Doc. 157-5, p. 11).

Harris was transferred to Big Muddy River on March 30, 2011 (Doc. 157-7, p. 12). Around that time, his pinky had stopped hurting, but it was crooked (*Id.*). He also was able to do weightlifting, but he was not able to squat or put pressure on his knee (*Id.* 13). Harris testified that the pain never 100 percent went away and that something had always been wrong with it (*Id.*). Sometimes it would click or buckle going up the stairs—sometimes his knee turned the wrong way, and he would "down for a week." (*Id.*). But when he complained at Big Muddy River, he would only receive ice. (*Id.*). Harris also requested a knee brace; that request was denied (*Id.* at pp. 13-14).

In June 2012, two years after his initial knee injury, Harris injured his knee again while playing basketball (Doc. 157-1, p. 13). While Harris does not recall hearing a popping at that time, he testified that his knee swelled up and caused him pain (*Id.*). He testified, however, that it was nothing like the August 2010 injury (*Id.*).

On November 13, 2014, Harris saw Dr. Larson at Big Muddy River for complaints of knee pain (Doc. 157-2, p. 4). Harris reported to Dr. Larson that he had injured his knee

in 2010 and then again in 2013[3] (*Id.*). Dr. Larson noted that Harris was not in acute distress, that his knee joint was not swollen, and that he was ambulatory without noticeable problems (DSUMF ¶ 18). Dr. Larson diagnosed Harris with right knee pain, ordered an x-ray, told Harris to stop playing basketball, and directed him to follow up in two weeks (*Id.*; Doc. 157-2, p. 4). The x-ray did not reveal a fracture, dislocation, or effusion. Instead, it showed mild spurring of the tibial spines, which are bony growths over the shin bone that can cause pain (*Id.* ¶ 19).

After examining Harris again on November 25, 2014, Dr. Larson suspected that Harris suffered from Patellofemoral Pain Syndrome (PFPS), known as "runner's knee," a condition that develops from overuse of the knee and causes pain (*Id.* ¶ 20). Because there is no cure for this problem, Dr. Larson directed the most common treatment: cessation of the activity that caused the problem, *i.e.*, basketball (*Id.*).

Harris was seen again for knee pain by a nurse on December 12, 2014, and again by Dr. Larson on December 26, 2014 (*Id.* ¶ 22).[4] Dr. Larson's diagnosis remained the same, but this time he ordered physical therapy (*Id.*). At this visit, Dr. Larson told Harris that he would not order an MRI because he did not believe it would show anything, and he did not believe Harris had an ACL tear (Doc. 157-5, p. 14). Harris told Dr. Larson that "this has been going on for too long" and that physical therapy would not help him (*Id.*).

On January 9, 2015, Physical Therapist Daniel Varel conducted the Lachman Test,

---

[3] Dr. Larson's affidavit states that Harris told him he reinjured his knee in 2013. Harris testified, and the medical records indicate, that this injury occurred in 2012.
[4] Dr. Larson measured both of Harris's knees to check for inflammation on November 13, 2014, and again on December 26, 2014. The first time, his knees measured 39 cm, and the second time they measured 41 cm. There is no explanation for his increase in circumference.

the McMurray Test, and the PCL Posterior Drawer Test, which assess for a deficiency of the ACL. The Lachman and McMurray tests were both positive, and Varel assessed Harris as having an ACL deficiency with possible meniscus derangement[5] (DSUMF ¶ 23; Doc. 157-2, p. 6). Ten days later, Harris saw Dr. Larson again for a follow up on the physical therapy consult (*Id.*). Dr. Larson considered Varel's concerns that Harris had a torn ACL and noted that he would request an MRI through the collegial review process (*Id.* ¶ 24; Doc. 157-2, p. 7). On January 23, 2015, Dr. Larson had a collegial review conference with Dr. Stephen Ritz regarding the MRI referral. After considering that Dr. Larson's physical examination of Harris did not generate any abnormal findings and that Harris ambulated without difficulty, the MRI was denied in lieu of the physical therapy being offered to Harris (*Id.* ¶ 26; Doc. 157-2, p. 7).

Dr. Larson examined Harris again on March 5, 2015, after Harris completed his physical therapy program (Doc. 157-2, p. 7). Harris reported knee pain when doing deep squats, as well as clicking and catching in the knee (*Id.*; DSUMF ¶ 29). Dr. Larson observed crepitation (grating, crackling, or popping under the skin and joints), but otherwise found that Harris could perform the normal activities of daily living—eating, bathing, dressing, toileting, walking, and continence (*Id.*).

Harris returned to Dr. Larson on June 1, 2015, complaining that his right knee hurt all the time and that physical therapy did not work (DSUMF ¶ 32). Because Harris's pain was persistent even after physical therapy, Dr. Larson made a second request for an

---

[5] The term "meniscus derangement" can encompass a number of knee conditions including joint disorders, damaged ligaments, and a torn meniscus (*Id.*).

MRI through the collegial process; it was approved on June 12, 2015, and scheduled for June 30, 2015 (*Id.* ¶ 33; Doc. 157-2, p. 9).

The MRI revealed a "chronic complete disruption of the ACL"—a complete tear of the ACL—along with damage to the medial meniscus. Harris had surgery to repair his torn ACL and medial meniscus on September 14, 2015 (*Id.* ¶ 41).

## LEGAL STANDARD

Summary judgment is proper only if the moving party can demonstrate "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970). *See also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004). A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

## DISCUSSION

I. **Defendants' Motion for Summary Judgment**

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on such

a claim, a plaintiff must show first that his condition was "objectively, sufficiently serious" and second that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). In this case, there is no argument that Harris did not suffer from objectively serious medical conditions.

Second, a prisoner must show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness" as that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987).

Put another way, a plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (citations omitted). "Even if a defendant recognizes the substantial

risk, he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (quoting *Farmer*, 511 U.S. at 843).

### A. Nurse Lynn Bradbury

There are material questions of fact that preclude judgment for Nurse Bradbury. When Nurse Bradbury first examined Harris, she noted no swelling, yet Harris states his knee was obviously swollen. She noted no functional limitations, but Harris had to be transported to the healthcare unit by wheelchair, and he told her he could not walk. He then walked with a heavy limp back to his cell. There also is an issue of fact as to whether Harris told Nurse Bradbury about his finger injury. According to Harris, Nurse Bradbury refused to examine his finger and told him to put in a nurse sick call request for that injury. If a jury were to credit Harris's version of the facts, Nurse Bradbury wholly failed to provide any effective treatment for the injuries he suffered.

Just as with doctors, nurses can be deliberately indifferent if they "knowingly disregard a risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citing *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)). Viewing the facts in the light most favorable to Harris, Nurse Bradbury disregarded the potential severity of Harris's knee injury in light of his inability to walk, his swelling, and his pain. In addition, by failing to refer him to a doctor, she may have unnecessarily delayed treatment that aggravated his condition and contributed to unnecessary pain. *See e.g., Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (finding the plaintiff stated a claim for deliberate indifference when he alleged a two-day delay of proper treatment for an openly

dislocated finger, causing unnecessary pain and disfigurement). Accordingly, Nurse Bradbury is not entitled to summary judgment.

### B. Dr. Vipin Shah

It is undisputed that Dr. Shah first became aware of Harris's injury on August 30, 2010, and stopped treating him when he was transferred on March 30, 2011. At his first visit with Dr. Shah, Harris described his knee injury and explained that he was in pain and his knee was swollen. Yet, Dr. Shah did not give Harris any pain reliever because Harris was about to be transferred to Stateville and would not be able to take the medication with him. Thus, the decision to not supply pain medication was not based on medical judgment but rather the prison's apparent blanket policy of not allowing inmates to transfer with pain medication.

A decision that is not based on medical judgment can be grounds for finding that Dr. Shah was deliberately indifferent to Harris's pain. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012) (stating that a prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards."). Thus, the failure to provide pain medication for an obviously painful injury is sufficient for this issue to go to a jury. *See Rivera v. Gupta*, 836 F.3d 839, 842 (7th Cir. 2016) ("The subjective component is the 'deliberate indifference' component and one way to satisfy it is by showing that the prison doctor provided no treatment even though the circumstances indicated that treatment clearly was warranted, thus permitting an inference that in

failing to provide any treatment the doctor had acted with a culpable state of mind (deliberate indifference, equivalent to recklessness in criminal law).").

Likewise, a jury could find that Dr. Shah's overall treatment of Harris's knee condition exhibited deliberate indifference. At his first visit with Dr. Shah, Harris told Dr. Shah that his knee had been swollen and painful for about a month, and he relayed the pop that he heard and the pain that he felt. When Dr. Shah saw Harris on November 8, 2010, he again prescribed conservative treatment despite Harris still reporting pain and swelling. At that time, Harris believed that Dr. Shah should have ordered an MRI instead of continuing on the same course of treatment.

It is true that Harris's mere disagreement with this course of treatment does not demonstrate deliberate indifference. *See Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision requires so significant departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment."). It is also true, however, that persisting in a course of treatment known to be ineffective has been recognized by the Seventh Circuit as a violation of the Eighth Amendment. *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). A jury could find Dr. Shah's insistence on conservative treatment, rather than pursuing an MRI at that time, to constitute deliberate indifference.

This conclusion is particularly appropriate in light of the fact that Physical Therapist Daniel Varel performed various physical tests on Harris's knee, which showed

that Harris may have an ACL deficiency. This begs the question, why didn't Dr. Shah do these tests in the first instance? If he had, especially in light of Harris's description of the injury, perhaps he would have caught the issue earlier. Based on this evidence, a jury could find that Dr. Shah's treatment was so far below accepted professional standards as to exhibit deliberate indifference. Again, the Court is mindful that Harris was not entitled to demand specific diagnostic testing, like an MRI. *Pyles*, 771 F.3d at 409, 411. But if the failure to perform the test was a significant departure from professional norms, it may support a finding of deliberate indifference.

As to Harris's finger injury, it is undisputed that when Dr. Shah became aware of the injury on September 22, 2010, he prescribed pain medication and ordered an x-ray of the finger. Dr. Shah then determined, based on the x-ray results, that Harris had a fracture that would heal on its own. There is no evidence that this decision was not based on medical judgment. While Harris believes that Dr. Shah should have done more to straighten his finger, there is no evidence that such a procedure was medically necessary at that time. A doctor may provide the care that is reasonable, so long as it is within a "range of acceptable courses based on prevailing standards in the field." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 1997). That Harris may disagree with the treatment and believe that additional care was necessary does not render Dr. Shah's treatment of his finger injury unconstitutional.

### C. Dr. Dennis Larson

Harris first saw Dr. Larson on November 13, 2014—four years after his initial injury—despite requesting medical care for his knee from the day he arrived on March

30, 2011 (Doc. 157-5, pp. 12-13).[6] Harris told Dr. Larson that he injured his knee in 2010 and again in 2013,[7] and Dr. Larson ordered an x-ray. He also told Harris to stop playing basketball. When Harris returned for a follow-up appointment on November 25, 2014, Dr. Larson formed the opinion, based on the x-ray and his examination of Harris, that he had "runner's knee." Yet Harris testified that he told Dr. Larson his history and that his knee condition had "been going on for too long" (Doc. 157-5). Dr. Larson also knew that Harris complained of his knee popping and catching, and that he was having trouble walking. Still, Dr. Larson refused to order an MRI because he didn't believe Harris had an ACL tear. Just as with Dr. Shah, it begs the question why Dr. Larson did not conduct the physical tests that Daniel Varel conducted, which would have revealed a problem with Harris's ACL.

By January 19, 2015, Dr. Larson believed an MRI referral was medically necessary to evaluate Harris's condition. Yet, because Dr. Larson's physical examination of Harris revealed no abnormalities, the MRI was denied, and the same course of conservative treatment was continued. After completing physical therapy on March 5, 2015, Harris again reported pain and clicking in his knee. Dr. Larson also observed grating, crackling, and popping under Harris's knee. Still, Dr. Larson did nothing because Harris could perform the normal activities of daily living. It was not until June 2015, after Harris reported constant pain in his knee, that Dr. Larson made a second request for an MRI.

---

[6] In his affidavit, Dr. Larson states: "Mr. Harris was regularly seen by Healthcare Unit personnel, as reflected in his medical records from the end of 2010, until late 2014, when I began treating him" (Doc. 157-2, p. 4). The medical records attached to Defendants' motion do not support this statement. There appear to be limited records from 2011 to 2014, and certainly not enough records to demonstrate that Harris was seen "regularly" (Doc. 157-1).

[7] As previously noted, Harris testified and the records indicate this second injury occurred in 2012.

Based on these facts and drawing all inferences in favor of Harris, a jury could find that Dr. Larson's delay in treatment, coupled with his decision to continue conservative and ineffective treatment, constitutes deliberate indifference. Dr. Larson is not entitled to judgment on Harris's claim relating to his knee.

On the other hand, however, there is no evidence that Dr. Larson knew about or treated Harris's pinky finger injury. Accordingly, to the extent that Harris claims Dr. Larson was deliberately indifferent to his finger injury, his claim fails.

### D. Qualified Immunity

Defendants mention the qualified immunity standard in their brief but provide no argument as to why they are entitled to such immunity. Therefore, the Court declines to address this issue except to note that the Seventh Circuit Court of Appeals has not extended qualified immunity to employees of a private corporation that contracts with the State of Illinois to provide medical care to inmates. *See Currie v. Chhabra*, 728 F.3d 626, 631–32 (7th Cir. 2013); *see also Shields v. Ill. Dep't of Corrs.*, 746 F.3d 782, 794 n.3 (7th Cir. 2014); *Richardson v. McKnight*, 521 U.S. 399, 412 (1997).

## II. Plaintiff's Motion for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (5th ed. 1995)). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). Harris

has the burden of demonstrating: a reasonable likelihood of success on the merits; no adequate remedy at law; and irreparable harm absent the injunction. *Planned Parenthood v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

Pursuant to Federal Rule of Civil Procedure 65(d)(2), a preliminary injunction binds only the parties, their officers or agents, or persons in active concert with the parties or their agents. The main purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

Here, Harris seeks medical care for his pinky finger injury. He notes that the injury is obvious—his finger is bent and painful. Unfortunately, however, there is no evidence that Harris suffers a functional limitation because of his deformed finger. And there is likewise no evidence that this "cosmetic deformity" requires medical intervention. Re-breaking the finger to straighten it is a procedure that is not medically necessary (Doc. 157-2, p. 3). Thus, the Court finds that Harris has failed to show irreparable harm absent an injunction, and he is not entitled to injunctive relief. For this reason, the warden will be dismissed without prejudice.

## Conclusion

For these reasons, the Motion for Summary Judgment filed by Defendants Bradbury, Larson, and Shah (Doc. 156) is **GRANTED in part and DENIED in part**, the Motion for Preliminary Injunction filed by Plaintiff Darius Harris (Doc. 173) is **DENIED without prejudice**, and the Motion for Recruitment of Counsel filed by Harris (Doc. 172) is **GRANTED**.

Furthermore, Warden Craig Foster is **SUBSTITUTED** for Warden Zachary Roeckeman, but he is **DISMISSED without prejudice** because no claim for injunctive relief remains in the case.

Judgment is granted in favor of Dr. Shah and Dr. Larson on Harris's claim that they were deliberately indifferent to his pinky finger injury. Judgment is denied as to all other claims. Harris shall proceed to trial on the claim that Dr. Shah and Dr. Larson were deliberately indifferent to his knee injury (Count 1) and on the claim that Nurse Bradbury was deliberately indifferent to his knee and pinky finger injuries (Count 2). Magistrate Judge Wilkerson is **DIRECTED** to recruit counsel to represent Harris at trial. Trial remains set for **August 14, 2018**; a Final Pretrial Conference will be held at **9:30 a.m.** on **July 26, 2018**.

**IT IS SO ORDERED.**

DATED:   March 16, 2018

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**